NO. 07-10-00361-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL E

MAY 13, 2011

---

COVENANT HEALTH SYSTEM, D/B/A COVENANT
MEDICAL CENTER, AND D/B/A COVENANT HEART &
VASCULAR INSTITUTE, AND D/B/A COVENANT HEART
INSTITUTE, AND D/B/A COVENANT WELL HEART
SERVICES, APPELLANT

v.

LINDA BARNETT AND ROBERT BARNETT, APPELLEES

---

FROM THE 72ND DISTRICT COURT OF LUBBOCK COUNTY;

NO. 2010-550,709; HONORABLE RUBEN GONZALES REYES, JUDGE

---

Before CAMPBELL and PIRTLE, JJ. and BOYD, S.J.[1]

**OPINION**

Appellant Covenant Health System[2] brings this interlocutory appeal[3] challenging

the order of the trial court denying its motion to dismiss the claims of appellees Linda

---

[1] John T. Boyd, Chief Justice (Ret.), Seventh Court of Appeals, sitting by assignment.

[2] The plaintiffs' pleadings named as defendant "Covenant Health System d/b/a Covenant Medical Center and d/b/a Covenant Heart & Vascular Institute and d/b/a Covenant Heart Institute and d/b/a Covenant Well Heart Services."

Barnett and Robert Barnett for their failure to serve an expert report. Finding the Barnetts' claims are health care liability claims, we reverse the trial court's order and remand the case to the trial court.

Background

Covenant advertised its Fifth Annual Heart Symposium in the Lubbock newspaper. The event was held at a Lubbock hotel on a Saturday morning in February 2008. The newspaper ad, which indicated the symposium was sponsored by Covenant Well Heart Services, began this way:

> All your life you've been told you have a Heart of Gold. Bring it in for an appraisal. Covenant's Fifth Annual Heart Symposium. Holiday Inn Park Plaza . . . .

The schedule printed in the ad indicated that the symposium's activities would include brunch, a "healthy heart cooking demonstration," and a presentation by the "keynote speaker," a nurse practitioner "considered one of the nation's foremost thought leaders in heart attack prevention." In addition, the schedule advertised "Free Heart Screenings" available from 8:00 to 11:00 a.m. The ad instructed "Water only for 12 hours prior to your free health screening." It gave a telephone number for registration.

Linda Barnett fasted as instructed and attended the heart symposium. She participated in the heart screening. According to allegations in the Barnetts' petition:

---

[3] *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(9) (West 2008).

During [the screening] Linda Barnett was told to step up and down on an aerobic step for three minutes. She was told that to achieve optimum results, she should try to keep time with the beat of a metronome that was set by a Covenant staff member.

The step, which was approximately 14 inches high, was placed close to a wall which forced Plaintiff Linda Barnett to lean back somewhat while stepping up on the step. In other words, she could not lean forward in a natural position when stepping up on the step without hitting her head on the wall.

After approximately two minutes into the three minute test, fatigued and already off balance stepping up and down, Plaintiff Linda Barnett lost her balance and fell as she came crashing down and shattered her left wrist as she attempted to catch herself.

There were numerous employees of [Covenant] milling about and visiting with each other . . . none of whom acted as a coach or a spotter, nor stood near to assist Plaintiff Linda Barnett and oversee her during this portion of the Fitness Screening, nor were close enough to Plaintiff Linda Barnett to catch her when she fell or to at least break her fall, nor did any of [Covenant's] employees or agents even attempt to minimize the injuries of Plaintiff Linda Barnett when she fell.

       ***

[Covenant] negligently failed to have anyone available to observe [Linda Barnett] as she performed the test. Had [Covenant] done so, [Covenant] would have been able to either observe that [Linda Barnett] needed to stop and get off the step or would have been close enough to have prevented [Linda Barnett] from falling or to have broken her fall, thus avoiding the serious injuries she sustained.

The Barnetts filed suit against Covenant but did not serve the expert report required by Texas Civil Practice & Remedies Code § 74.351. Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a),(b) (West 2011). Covenant filed a motion to dismiss on the ground that the Barnetts alleged a health care liability claim, requiring an expert report, but no report was served. The Barnetts responded that the screening did not constitute

3

medical treatment, hence no expert report was required. After hearing the arguments of the parties, the trial court denied Covenant's motion to dismiss.[4] This appeal followed.

Analysis

Through a single issue, Covenant asserts the trial court abused its discretion by denying the motion to dismiss. It argues the Barnetts' claim is a health care liability claim for which Chapter 74 requires an expert report and, because the Barnetts did not furnish an expert report, the trial court had no discretion to refuse dismissal of the case.

We review a trial court's decision to grant or deny a motion to dismiss for failure to timely serve the expert report required by § 74.351(a) under an abuse of discretion standard. *See Jernigan v. Langley,* 195 S.W.3d 91, 93 (Tex. 2006) (per curiam) (former statute); *Jones v. King,* 255 S.W.3d 156, 158 (Tex.App.--San Antonio 2008, pet. denied). However, when the issue presented requires statutory interpretation or a determination whether Chapter 74 applies to a claim, the issue presents a question of law which we review de novo. *Holguin v. Laredo Reg'l Med. Ctr., L.P.,* 256 S.W.3d 349, 352 (Tex.App.--San Antonio 2008, no pet.). Whether a claim constitutes a health care liability claim is a question of law. *Id.*

---

[4] Based on argument at the hearing on Covenant's motion, it appears the Barnetts' pursuit of the case as one for ordinary negligence may have been influenced by the first opinion in *Marks v. St. Luke's Episcopal Hosp.,* which was subsequently withdrawn. No. 07-0783, 2009 Tex. Lexis 636, at *20 (Tex. Aug. 28, 2009) (negligence claim based on defectively assembled or maintained hospital bed was not health care liability claim).

4

A plaintiff who files a health care liability claim must serve an expert report within 120 days of filing suit. Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a) (West 2011). Subject to an exception not relevant here, if an expert report has not been served within that period, on the motion of the affected health care provider a trial court must enter an order that (1) awards to the affected health care provider reasonable attorney's fees and costs of court incurred by the provider, and (2) dismisses the health care liability claim with prejudice, as to that provider. Tex. Civ. Prac. & Rem. Code Ann. § 74.351(b) (West 2011).

A "health care liability claim" is:

[A] cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care, which proximately results in injury to or death of a claimant, whether the claimant's claim or cause of action sounds in tort or contract.

Tex. Civ. Prac. & Rem. Code Ann. § 74.001(a)(13) (West 2011). "Health care" means any act or treatment performed or furnished, or that should have been performed or furnished, by any health care provider for, to, or on behalf of a patient during the patient's medical care, treatment, or confinement. Tex. Civ. Prac. & Rem. Code Ann. § 74.001(a)(10) (West 2011). A hospital is a health care provider, as is its employee or agent acting in the course and scope of the employment or contractual relationship. Tex. Civ. Prac. & Rem. Code Ann. § 74.001(a)(11)(G), (12)(A)(vii),(B)(ii) (West 2011).

The statute does not include a definition of "treatment," so its meaning in this context is one consistent with the common law. *See* Tex. Civ. Prac. & Rem. Code Ann.

5

§ 74.001(b) (West 2011) ("Any legal term or word of art used in this chapter, not otherwise defined in this chapter, shall have such meaning as is consistent with the common law"); *cf. Kendrick v. Garcia,* 171 S.W.3d 698, 704 (Tex.App.--Eastland 2005, pet. denied) ("[Section 74.001(b)] essentially restates the rule of statutory construction that terms in a statute are to be given their plain meaning"). The court in *Rowntree v. Hunsucker,* 815 S.W.2d 779 (Tex.App.--Texarkana 1991), *rev'd on other grounds,* 833 S.W.2d 103 (Tex. 1992), cited the 1990 edition of Black's Law Dictionary definition of "treatment" as "[a] broad term covering all the steps taken to effect a cure of an injury or disease; including examination and diagnosis as well as application of remedies." 815 S.W.2d at 783 (citing Black's Law Dictionary 1502 (6th ed. 1990));[5] *see Doe v. Univ. of Cincinnati* (1988), 42 Ohio App. 3d 227, 230, 538 N.E.2d 419, 423 (quoting same definition from 1979 fifth edition of Black's Law Dictionary). Other courts of appeals have made use of the definition of "treatment" from Mosby's Medical Dictionary, *i.e.*, "the care and management of a patient to combat, ameliorate, or prevent a disease, disorder, or injury." *Nexus Recovery Ctr., Inc. v. Mathis,* No. 05-09-0273-CV, 2011 Tex. App. Lexis 974, at *7 n.3 (Tex.App.--Dallas Feb. 10, 2011, n.p.h.); *Ghazali v. Brown,* 307 S.W.3d 499, 503 (Tex.App.--Fort Worth 2010, pet. granted); *Tesoro v. Alvarez*, 281 S.W.3d 654, 659 (Tex.App.—Corpus Christi 2009, no pet.) (each quoting Mosby's Medical Dictionary 1880 (8th ed. 2009)). The Consent to Medical Treatment Act defines "medical treatment" as "a health care treatment, service, or procedure designed to maintain or treat a patient's physical or mental condition, as well as preventative care." Tex. Health & Safety Code Ann. § 313.002(6) (West 2010).

---

[5] Later editions of Black's do not include the term.

As noted, Chapter 74's definition of "health care" includes any act performed, or that should have been performed, by a health care provider for a patient during the patient's treatment. All of the definitions of "treatment" we have cited include disease diagnosis or prevention. Covenant's heart screening had as its purpose the diagnosis or prevention of heart disease or disorder in the screening participants.[6] Although the record does not fully describe the screening, it is clear it included timed exercise with some monitoring by Covenant. It is fair to infer that Linda Barnett registered before the test, as instructed by Covenant's advertisement. As also instructed, she fasted for twelve hours before the test.[7] We have no occasion here to characterize all the events that formed part of the heart symposium, but we believe the heart screening, though performed at no cost, must be held to be within the definition of "treatment." Acts performed, or that should have been performed, during the heart screening Linda Barnett sought from Covenant therefore are within Chapter 74's definition of "health care."

It is the underlying nature of a claim that determines whether it is a health care liability claim. *Yamada v. Friend,* No. 08-0262, 2010 Tex. Lexis 1012, at \*8 (Tex. Dec. 17, 2010) (citing *Garland Cmty. Hosp. v. Rose,* 156 S.W.3d 541, 543 (Tex. 2004)). That nature is not shaped by artful pleading. *Id.* at \*9. A cause of action against a health care provider is a health care liability claim if it is based on a claimed departure from an

---

[6] The term "screening" is defined as "[t]he examination of a group of usually asymptomatic individuals to detect those with a high probability of having or developing a given disease." The American Heritage Stedman's Medical Dictionary 745 (2002).

[7] So far as we are able to tell, the record does not explain what aspects of the heart screening required participants to fast.

accepted standard of health care. A claim alleges a departure from accepted standards of health care if the act or omission alleged in the complaint is an inseparable part of the rendition of health care services. *Diversicare General Partner, Inc., v. Rubio,* 185 S.W.3d 842, 848 (Tex. 2005); *Buck v. Blum,* 130 S.W.3d 285, 290 (Tex.App.--Houston [14th Dist.] 2004, no pet.) (generally cause of action is considered health care liability claim when based on breach of a standard of care applicable to health care providers). Whether the expert testimony of a medical or health care professional is necessary may be an important factor in determining whether a claim arises from an inseparable part of the rendition of health care services. *Saleh v. Hollinger,* No. 05-10-0339-CV, 2011 Tex. App. Lexis 11, at *13 (Tex.App.--Dallas Jan. 4, 2011, pet filed) (citing *Diversicare,* 185 S.W.3d at 848). However, the fact that expert testimony may not ultimately be necessary to support a verdict at trial does not necessarily mean the claim is not a health care liability claim. *Murphy v. Russell,* 167 S.W.3d 835, 838 (Tex. 2005). The expert report requirement is a threshold requirement for the continuation of the lawsuit, not a requirement for recovery. *See id.*

On appeal, the Barnetts primarily emphasize their assertion Covenant's employees were negligent through their failure to properly supervise Linda Barnett's performance of the cardio-vascular step test. That omission was an inseparable part of Covenant's heart screening. *See Valley Baptist Med. Ctr. v. Azua*, 198 S.W.3d 810, 814 (Tex.App.--Corpus Christi 2006, no pet.) (act of hospital employee assisting patient into wheelchair was inseparable part of rendition of medical services). If the Barnetts' claims are based on asserted departures from accepted standards of health care, they are health care liability claims. *Diversicare,* 185 S.W.3d at 848.

The record contains evidence of guidelines adopted by the health care community for exercise testing like that conducted by Covenant. Attached in part as an exhibit to the Barnetts' original petition, and attached also to a pleading filed by Covenant in support of its motion to dismiss was the step test protocol from the American College of Sports Medicine's *Guidelines for Exercise Testing and Prescription*. The protocol calls for evaluation of the participant for risk factors commonly associated with coronary artery disease. According to the protocol, clearance for participation in the exercise testing rests largely in the evaluator's discretion. For example, the guidelines require the evaluator to determine the presence of "absolute" and "relative contraindications" to exercise testing, some of which are specified in two lists of medical terms. The guidelines also call for termination of the step test if the participant asks to stop, or on the occurrence of such events as angina or angina-like symptoms; a significant drop or an excessive rise in blood pressure; light-headedness, confusion, ataxia, pallor, cyanosis, nausea, or cold and clammy skin; failure of heart rate to increase with increased exercise intensity; physical or verbal manifestations of severe fatigue; and unusual or severe shortness of breath.

We see the Barnetts' claims that Covenant's personnel at the symposium failed to watch and attend Linda Barnett's performance of the step test as asserting a breach of the standard of care applicable to health care providers conducting such exercise testing. *See Buck*, 130 S.W.3d at 291 (allegation defendants failed to properly supervise employee physician essentially was allegation of violation of standard of care). And we see such a claim as one requiring expert testimony of the particulars of the standard applicable to a step test and the manner in which Covenant's supervision

9

of Linda Barnett failed the standard. The Barnetts contend otherwise, arguing no medical expert is needed to explain how Linda Barnett's injury "could have been prevented by simply offering her a steady hand." They also argue, "A medical school education is not required to realize a middle aged woman who has not eaten for 12 hours may stumble while performing a step test."

We disagree that the decision when and under what circumstances a participant in a cardio-vascular step test should have the kind of close supervision the Barnetts posit is the substance of common knowledge. *See Diversicare*, 185 S.W.3d at 851 (similar analysis). The American College of Sports Medicine's guidelines anticipate that the person conducting the test will possess sufficient medical competence to evaluate the test participant and make the medical judgments inherent in the decision whether to continue the test. The existence and nature of such guidelines established by the health care community indicate that a judgment concerning Covenant's conduct of Linda Barnett's step test requires specialized knowledge, and ultimately support a conclusion the Barnetts' claims are based on a claimed departure from accepted standards of health care. *See Garland Cmty. Hosp. v. Rose*, 156 S.W.3d 541, 546 (Tex. 2004) (citing promulgation of guidelines governing hospital credentialing process to support similar conclusion).

To agree with the Barnetts would effectively reduce the standard of care of a heart screening from health care professional to ordinary care. As did the court in *Diversicare,* 185 S.W.3d at 853-54, we find such a result was not intended by the Legislature. Because the Barnetts' claim that Linda Barnett was injured as a result of

poor supervision of the step test is one based on a claimed departure from an accepted standard of health care, it is a health care liability claim. *Diversicare* at 848.

The Barnetts contend on appeal that none of the Covenant employees conducting Linda Barnett's heart screening were "doctors or nurses; they were not medical care professionals." Because the employees could exercise no medical judgment, they argue, the claim may not be classified a health care liability claim. As Covenant pointed out at oral argument, the record does not disclose the qualifications of those conducting Linda Barnett's screening. But for a more fundamental reason, we find no merit to the argument. Under Chapter 74, health care is not limited to the actions of doctors and nurses. *See Marks v. St. Luke's Episcopal Hosp.,* 319 S.W.3d 658, 671-72 (Tex. 2010) (plurality op.) (Johnson, J., concurring) (discussing predecessor act). We have already noted that "health care" includes "*any act or treatment* performed or furnished, or that should have been performed or furnished, by *any health care provider* for, to, or on behalf of a patient during the patient's medical care, treatment, or confinement." Tex. Civ. Prac. & Rem. Code Ann. § 74.001(a)(10) (West 2011) (emphasis supplied). And a "health care provider" includes a hospital as well as its "employee or agent acting in the course and scope of the employment or contractual relationship." Tex. Civ. Prac. & Rem. Code Ann. § 74.001(a)(11)(G), (12)(A)(vii),(B)(ii) (West 2011). The Barnetts do not dispute that Covenant is a health care provider nor is it argued the Covenant employees conducting the test acted outside the course and scope of their employment. Thus from a plain reading of the statute, and solely for the purpose of determining whether the Barnetts' claims are or are not

11

health care liability claims, the qualifications of the employees Covenant selected to conduct the heart screening matter not.

The Barnetts also argue on appeal Covenant negligently placed the test step too close to the wall, and such negligence was a proximate cause of Linda Barnett's injury. According to the Barnetts, placement of the step "at an unsafe distance is contrary to common sense, and is not akin to medical expertise." Components of this, or just about any healthcare procedure, may be highlighted and particularized as involving conduct measured by ordinary standards of care. *Yamada,* 2010 Tex. Lexis 1012, at *13. But when, as here, the case presents a health care liability claim, a plaintiff may not split the claim and on a divided portion recast the case as one in ordinary negligence. *See Turtle Healthcare Group, L.L.C. v. Linan,* No. 09-0613, 2011 Tex. Lexis 323, at *6-*7 (Tex. April 29, 2011) (per curiam); *Yamada* at *13 (citing *Diversicare,* 185 S.W.3d at 854); *Marks,* 319 S.W.3d at 669 (Johnson, J., concurring) ("when the substance of a patient's claim for damages comes within the statutory definition of a health care liability claim, then [Chapter 74] applies to all the plaintiff's claims against the health care provider based on that injury"). Moreover, a health care liability claim may arise also from a claimed departure from accepted standards of safety. Tex. Civ. Prac. & Rem. Code Ann. § 71.001(a)(13) (West 2011). The placement of the aerobic step, for the purpose of conducting the heart screening, was an integral and inseparable part of the health care services provided. If the unsafe condition of the step caused Linda Barnett's injury, "the gravamen of the resulting cause of action is a health care liability claim." *Marks,* 319 S.W.3d at 664.

12

For these reasons, we sustain Covenant's sole issue.

## Conclusion

While the Barnetts pursued the case as one for ordinary negligence, we conclude it constitutes a health care liability claim. It is undisputed the Barnetts did not serve the required expert report. The trial court abused its discretion by denying Covenant's motion to dismiss. Covenant asked for its attorney's fees in its motion to dismiss, but did not offer evidence of its incurred attorney's fees at the hearing on its motion. *Cf. Victoria Gardens of Frisco v. Walrath*, 257 S.W.3d 284, 291 (Tex.App.—Dallas 2008, pet. denied) (health care provider prevailing on appeal but not pleading for attorney's fees not entitled to remand). We reverse the trial court's order and remand the cause to the trial court for the limited purposes of determining Covenant's reasonable incurred attorney's fees and costs and entry of an order dismissing with prejudice the Barnetts' claims against Covenant. *See Gingrich v. Scarborough,* No. 09-09-0211-CV, 2010 Tex. App. Lexis 3139, at *14-*15 (Tex.App.--Beaumont Apr. 29, 2010, no pet.) (mem. op.) (after reversing trial court's denial of motion to dismiss claims against pharmacy defendants for failure to serve adequate expert report, court remanded for determination of attorney's fees despite absence of proof of fees at hearing); *Thoyakulathu v. Brennan*, 192 S.W.3d 849, 856 (Tex.App.--Texarkana 2006, no pet.) (remanding after reversing trial court's denial of motion to dismiss for failure to serve expert report). *Cf. Garcia v. Gomez*, 319 S.W.3d 638 (Tex. 2010) (remanding "physician's attorney's fees

claim to the trial court for further proceedings," *id.* at 643-44, over dissent objecting to giving physician "a second chance to satisfy his burden of proof," *id.* at 645).[8]

James T. Campbell
Justice

Pirtle, J., concurring and dissenting.

---

[8] In his dissenting opinion, Chief Justice Jefferson cited, among other cases, cases under former article 4590i in which courts of appeals held that nothing in that statute modified the general rule that a party seeking attorney's fees must present evidence of attorney's fees. 319 S.W.3d at 646, citing, inter alia, *Estrello v. Elboar,* 965 S.W.2d. 754, 759 (Tex.App.--Fort Worth 1998, no pet.). *See also Tibbetts v. Gagliardi,* 2 S.W.3d 659, 665 (Tex.App.--Houston [14th Dist.] 1999, pet. denied) (holding trial court erred in awarding attorney's fees to physicians in absence of any evidence of attorney's fees).